# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

| | |
|---|---|
| **TRINITY BONNER,** : | |
|       **Plaintiff,** : | |
| **v.** : | **CASE No. _____** |
| : | |
| **ETHICON, INC. and JOHNSON** : | **COMPLAINT AND DEMAND FOR A** |
| **& JOHNSON,** : | **JURY TRIAL** |
|       **Defendants.** : | |
| : | |
| : | |
| _____ : | |

Plaintiff TRINITY BONNER ("Plaintiff") files this Complaint and for causes of action against Defendants ETHICON, INC. and JOHNSON & JOHNSON ("Defendants" or "Ethicon Defendants"), and alleges as follows:

## INTRODUCTION

1.     On or about June 15, 2015, Plaintiff TRINITY BONNER was surgically implanted with a Gynecare TVT-O (the "TVT-O"), a pelvic mesh product designed, manufactured, and marketed by the Ethicon Defendants.

2.     Although the TVT-O was intended to treat stress urinary incontinence, neither Plaintiff nor her healthcare providers were warned that the TVT-O was defective and negligently designed and manufactured. As a result of being surgically

1

implanted with Defendants' unreasonably dangerous defective Pelvic Mesh Product, Plaintiff has suffered, and continues to suffer, debilitating injuries, as described further herein. Plaintiff brings this suit for damages related to those injuries.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy exceeds $75,000 and the Plaintiff is a citizen of a different state than the Defendants.

4.     At all times material hereto, Defendants were engaged in the business of developing manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, including Florida, either directly or indirectly, medical devices intended to treat stress urinary incontinence and/or pelvic organ prolapse, including the Ethicon Gynecare TVT-O ("Pelvic Mesh Product") that was implanted in Plaintiff in Panama City, Florida.

5.     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district. Specifically, Plaintiff was implanted with the products at issue at the in this district at Bay Medical Center in Panama City, Florida, and was injured in this district.

6.      Defendants are subject to *in personam* jurisdiction in the U.S. District Court for the Northern District of Florida because Defendants placed defective products in the stream of commerce and all or some of those products were implanted into and caused personal injuries to Plaintiff, a Florida resident, in the State of Florida. The Defendants have sufficient minimum contacts in Florida or otherwise intentionally avails itself of the Florida market through, without limitation, its advertisement, promotion, marketing, sales and/or distribution and other business activities, so as to render the exercise of jurisdiction over it by the Florida courts consistent with traditional notions of fair play and substantial justice.

## **PARTIES**

7.      Plaintiff TRINITY BONNER is a citizen and resident of Florida who was implanted with Defendants' defective medical device at the Bay Medical Center, 615 N. Bonita Ave., Panama City, Florida, 32401.

8.      Defendant Ethicon, Inc. ("Ethicon") is a wholly owned subsidiary of Defendant Johnson & Johnson with its corporate headquarters in Somerville, New Jersey. Defendant Ethicon is a foreign corporation licensed to do business in the State of Florida and may be served with process by serving its registered agent, CT Corp. System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201-3136. Defendant Ethicon is a wholly owned subsidiary of Defendant Johnson & Johnson.

9.      Defendant Johnson & Johnson (sometimes referred to herein as "J&J")

is a New Jersey corporation that has its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey. Defendant Johnson & Johnson does business in the State of Florida and may be served with process by serving its registered agent at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey.

10.     According to its website, Johnson & Johnson is the world's largest and most diverse medical and diagnostics company, with its worldwide headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  J&J organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing, promotion, training, distribution, and sale of its' pelvic floor repair products, including the product at issue herein.  Within J&J there are three business segments, medical devices, pharmaceutical, and consumer.  Within the medical devices segment are "Business Units," including the "Ethicon Franchise."  The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution, and sale of the product at issue in this case.  The Chairman for the Ethicon Franchise is employed by J&J.  The companies which comprise the Ethicon Franchise are thus controlled and managed by J&J and include, but are not limited to Ethicon, Inc.

11.     J&J has direct or constructive possession or control of Ethicon's assets and decision-making.  Acting through its business units which make up its Medical

4

Devices business segment, including Ethicon, Inc., J&J was involved in the continued research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of medical devices including the TVT-O device at issue in this case.

12.    J&J is a holding company, the purpose of which is (1) to coordinate the administration, finances, and activities of its subsidiary companies and business units including Ethicon, Inc.; (2) to act as manager; and (3) to direct or coordinate the management of its subsidiary companies and business unites or of the business, property, and estates of any subsidiary company and business units, including Ethicon, Inc.

13.    The website on which the pelvic repair mesh products are or were listed, described, and marketed, including the product at issue in this case, has at all times been maintained and operated by J&J. See https://www.jnjmedicaldevices.com/en-US/companies/ethicon/products (last viewed 7/20/2021).

14.    The financial accounts of the Ethicon, Inc. business unit are consolidated within those of J&J.  Ethicon's assets and properties are controlled by J&J.

15.    J&J is the owner of 100% of the shares of Ethicon, Inc. stock and assets, including the rights to Ethicon, Inc.'s patents and intellectual property.  J&J has control over Ethicon Inc.'s activities, operations, and policies.

16.     Ethicon, Inc. acts solely as agent for J&J and Ethicon, Inc.'s policies and business operations and decisions have been controlled by J&J.  J&J and Ethicon combine their property and labor in a joint venture, enterprise, or undertaking for profit, with rights of mutual control.

17.     J&J is liable for any acts and/or omissions by or through Ethicon, Inc. Ethicon, Inc. is organized and controlled, and its business is conducted in such a manner as to make it merely an agent, alter ego, or business conduit of J&J.  J&J has not dealt with Ethicon, Inc. at arms-length but instead has dominated and controlled Ethicon, Inc.'s activities, policies, and decisions.  For example, J&J has made the decision to restructure the Medical Devices business segment to which the Ethicon business unit belongs as a streamlining and cost-savings measure.  J&J's restructuring of the Medical Devices business segment resulted in a decrease or discontinuation of investment and research and development with respect to pelvic mesh and other surgical mesh devices and elimination of a sizeable portion of the workforce within the Medical Devices business segment, including many at Ethicon, Inc.

18.     J&J has mingled the accounts, records, and property of Ethicon with its own.  J&J has held itself out to the public as one entity with business unit/division Ethicon, Inc.  J&J has expressly or impliedly assumed Ethicon's liabilities, including liabilities associated with the pelvic mesh product implanted in Plaintiff.  J&J insures

6

Ethicon, Inc. and its other business units against product liability claims through a wholly owned, captive insurance company.  J&J has paid Ethicon, Inc.'s debts and expenses.  Because Ethicon, Inc.'s assets and capital are subject to the ownership and control of J&J, and because the corporate form of Ethicon, Inc. has been disregarded and abused by J&J, Ethicon, Inc. is undercapitalized and the failure to disregard Ethicon, Inc.'s corporate form would result in the inequitable and unjust result that Plaintiff may be unable to satisfy any judgment ultimately obtained against Ethicon, Inc.  By assuming Ethicon, Inc.'s liabilities, disregarding Ethicon, Inc's corporate form, and by taking affirmative actions to deplete the assets of Ethicon, J&J has promoted a fraud or injustice on Plaintiff.

19.    J&J, directly and/or through the actions of its agent and business Ethicon, Inc., has at all pertinent times been responsible for the research, design, development, testing, manufacture, production, marketing, promotion, labeling, distribution, and/or sale of the TVT-O product at issue in this civil action.

20.    Defendants are individually, jointly, and severally liable to Plaintiffs for damages suffered by Plaintiff arising from the Defendants' design, manufacture marketing, labeling, distribution, and sale if their TVT-O product at issue in the instant suit, effectuated directly and indirectly though their respective agents, servants, employees, and/or owners, all acting within the course and scope of their respective agencies, services, employments, and/or ownership.

21.     To the extent that Ethicon is claimed to maintain any separate corporate identify from J&J, the corporate identify of Ethicon should be pierced so that Ethicon's assets and liabilities are considered the assets and liabilities of J&J, and J&J should be held liable in the same manner as Ethicon, Inc. for any and all of Plaintiff's injuries and damages.

22.     Defendants are vicariously liable for the acts and omissions of their employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

23.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and /or selling such devices, including the TVT-O.   Defendants manufacture, market, advertise, promote, and sell products worldwide.

24.     Johnson & Johnson and Ethicon Inc.  are collectively referred to herein as "Defendants," "Ethicon Defendants," or "Ethicon."

## FACTUAL BACKGROUND

### *The Pelvic Mesh Products*

25.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such devices, including

8

the GYNECARE TVT-O (the "TVT-O"), the product at issue in this case, sometimes referred to herein as the "Pelvic Mesh Product."

26.    Defendants' Pelvic Mesh Products are products targeted at women who suffer from pain, discomfort, and stress urinary incontinence as a result of weakening or damage to the walls of the vagina. The Pelvic Mesh Products are represented by Defendants to correct and restore normal vaginal structure by implantation of polypropylene mesh in the vaginal wall tethered in place by two arms that extend up through the buttocks or to prevent stress urinary incontinence by implantation of a strip of mesh under the urethra for support. The Pelvic Mesh Products were and are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting stress urinary incontinence and pelvic organ prolapse.

27.    Prior the implantation of the Pelvic Mesh Product at issue in this claim, Defendants sought and obtained Food and Drug Administration ("FDA") approval to market the Pelvic Mesh Product under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required.

28.     Despite claims that the monofilament polypropylene mesh in the Pelvic Mesh Products, including the TVT-O, is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and promotes an immune response. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Certain information was available in the medical literature regarding the dangers of polypropylene mesh and manufacturers should have been aware of this literature.

    a.    Shrinkage and bacteria lead to an evolving process and increased erosion (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449).

    b.    Polypropylene mesh has long been known to shrink (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). By 1998, polypropylene mesh was known to shrink 30-50%. This was subsequently confirmed in 2007 (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). Predominate infection/inflammation was noted in 2007 in explanted

polypropylene samples (Yahi Y. Int Urogyn J 2007; 18(Suppl 1):S149).

c.    The weave of the mesh produces very small interstices which allow bacteria to enter and to hide from the host defenses designed to eliminate them. The bacteria can secrete an encasing slime (biofilm) which further serves to protect them from destruction by white blood cells and macrophages (Osterberg B. ActaChirScand1979; 145:431, Merritt K. J BiomatAppl 1991; 5:185, An Y. J Biomed Mater Res (ApplBiomat) 1998; 43:338).

d.    The large surface area promotes wicking of fluids and bacteria which provides a safe haven for bacteria which attach themselves to the mesh during the insertion process (Mahmoud W. J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

e.    The size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses (Mahmoud W. J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

f.    Polypropylene is impure: There is no such thing as pure polypropylene. Polypropylene contains about 15 additional compounds which are leached from the polypropylene and are toxic to tissue which enhances the inflammatory reaction and the intensity of fibrosis (Sternschuss G. J Urol 2012; May 12 epub, Frostling H. Scand J Work Environ Health 1984; 10:163).

g.    Prolene (polypropylene) was shown to be not inert in 1986 and again in 2003 with flaking and fissuring demonstrated by scanning electron microscopy which leads to degradation and release of toxic compounds. This enhances the inflammatory and fibrotic reactions (Coda A. Hernia 2003; 7:29, Jongebloed WL. Doc Ophthalmol 1986; 64:143–52).

h.    With the loss of polypropylene due to degradation, the surface area is greatly increased thus providing greater areas for bacterial adherence and more elution of toxic compounds from the polypropylene and also the freed toxic polypropylene itself, all of which increases the inflammatory reaction and intensity of fibrosis (Jongebloed W. Doc Ophth 1986; 64:143, Sternschuss G. J Urol 2012; May 12 epub, Clave A. Int Urogyn J 2010; 21:261).

i.  Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia [painful sexual intercourse]. Cosson, M., et al., Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material? Int Urogynecol J Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., Tensile properties of commonly used prolapse meshes. Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., Complications requiring reoperation following vaginal mesh kit procedures for prolapse. Am J Obstet Gynecol, 2008. 199(6): p. 678 e1-4.

j.  Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink in vivo leading to increased stiffness, pain and poor restoration of the normal properties of the vagina. Dora, C.D., et al., Time dependent variations in biomechanical properties of cadaveric fascia,

13

porcine dermis, porcine small intestine submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery. J Urol, 2004. 171(5): p. 1970-3.

k.   Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection. Birch C, Fynes MM. The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery. Curr Opin Obstet Gynecol. 2002; 14:527–595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. High complication rate identified in sacrocolpopexy patients attributed to silicone mesh. J Urol. 2005;65:1099–1103.

29.    Despite claims that the monofilament polypropylene mesh in the Pelvic Mesh Product is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and promotes an immune response. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

30.    The Pelvic Mesh Product has been and continues to be marketed to the medical community and to patients as a safe, effective, and reliable medical device that can be implanted by safe, effective, and minimally invasive surgical techniques.

31.     Defendants marketed and sold the Pelvic Mesh Products, including the TVT-O, through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies included, but are not limited to, aggressive marketing and the provision of valuable cash and non-cash benefits to healthcare providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of this product.

32.     Contrary to the representations and marketing of Defendants, the Pelvic Mesh Products, including the TVT-O, have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating revision surgeries, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff. The defects stem from many issues, including:

> a.     the use of polypropylene material in the Pelvic Mesh Product and the immune reaction that results;
>
> b.     the design of the Pelvic Mesh Product to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause immune reactions and subsequent tissue breakdown;
>
> c.     the contraction or shrinkage of the mesh;

    d.      biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade;

    e.      degradation of the mesh itself over time which causes the internal tissue to degrade;

    f.      the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

    g.      the design of the trocars (devices used to insert the Pelvic Mesh Product into the vagina) requires tissue penetration in nerve-rich environments, which results frequently in the destruction of nerve endings.

33.    Pelvic mesh products used for the surgical management of stress urinary incontinence (SUI) in women are primarily two different designs: the transobturator sling (frequently referred to as a TOT or TVT-O and the type of product at issue in this case) and the retropubic sling (frequently referred to as a TVT). The transobturator sling passes through the obturator space into the thigh, while the retropubic sling hammocks the urethra and exits up and out behind the pubic bone. In 2006, Defendants also began selling a "mini-sling," named the TVT-Secur, which was a shorter sling anchored directly to either the retropubic fascia (the

"U method") or the obturator internus muscle (the "H method").

34.     Transobturator slings cause nerve injuries, including obturator neuralgia, pudendal neuralgia, ilioinguinal neuralgia, and Complex Regional Pain Syndrome Type 2. These diagnoses are known for their disabling vaginal pain what makes sexual intercourse impossible, pelvic and extrapelvic pain that reduces mobility to a sedentary level, and bowel and bladder dysfunction that may include an inability to evacuate the bowels and bladder associated with severe anorectal pain.

35.     Upon information and belief, Defendants have consistently underreported and withheld information about the propensity of their Pelvic Mesh Products, including the TVT-O and its predicate devices, to fail and cause injury and complications, and have misrepresented the efficacy and safety of these products, through various means and media, actively and intentionally misleading the public.

36.     Despite the chronic underreporting of adverse events associated with the Pelvic Mesh Products, enough complaints were recorded for the Food and Drug Administration ("FDA") to issue a public health notification regarding the dangers of these devices.

37.     On October 20, 2008, the FDA issued a Public Health Notification that described over a thousand (1,000) complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to the Pelvic Mesh Products and other similar products. Although the FDA notice did not

identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that Defendants are some of the manufacturers of the products that are the subject of the notification.

38.    On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of pelvic organ prolapse was an area of **"continuing serious concern"** (emphasis added).  The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of pelvic organ prolapse were "not rare." These serious complications include, but are not limited to, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization. The FDA concluded that it was not clear that transvaginal repair of pelvic organ prolapse and stress urinary incontinence with mesh-kits was more effective than traditional non-mesh repair of these conditions. The FDA conducted a systematic review of the published scientific literature from 1996 to 2011 and concluded that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non

mesh repair." In the July 13, 2011, Safety Communication, the FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development new complications.  Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible."  The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011, was known or knowable to Defendants and was not disclosed in any manner.

39.   Defendants have further known the following:

a.   that some of the predicate devices for the Pelvic Mesh Products had high failure and complication rates, resulting in the recall of some of these predicate devices;

b.   that there were and are significant differences between the Pelvic Mesh Products and some or all of the predicate devices, rendering them unsuitable for designation as predicate devices;

c.   that these significant differences render the disclosures to the FDA incomplete and misleading; and

d.   that the Pelvic Mesh Product was and is causing numerous patients severe injuries and complications.

40.     Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including Plaintiff. As a result, Defendants actively and intentionally misled and continue to mislead the public into believing that the Pelvic Mesh Products and the procedures for implantation were and are safe and effective.

41.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Pelvic Mesh Products.

42.     Defendants failed to design and establish a safe, effective procedure for removal of the Pelvic Mesh Product; thus, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Pelvic Mesh Products.

43.     Feasible, reasonable, and suitable alternative designs as well as reasonable suitable alternative procedures and instruments for repair of stress urinary incontinence have existed at all times relevant to this matter, including, but not limited to the following: the Burch Procedure colposuspension with delayed absorbable sutures; autologous fascia slings; an allograft sling using a product like Repliform or other biological matrix; a sling with less polypropylene such as Ultrapro; a retropubic sling; a retropubic mini-sling, such as the TFS device from TFS Surgical; a retropubic sling or retropubic mini-sling comprised of a polymer-based alternative to polypropylene, such as Polyvinylidene fluoride (PVDF); or a

transobturator sling comprised of PVDF.

44.    The Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to Defendants, as they generated the instructions for use, created the procedures for implanting the device, and trained the implanting physicians.

45.    Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the Pelvic Mesh Product, and thus increase the sales of this product.

46.    The Pelvic Mesh Product implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, as well as being in the condition directed by and expected by these Defendants.

47.    Plaintiff and her physician foreseeably used and implanted the Pelvic Mesh Product and did not misuse or alter this product in an unforeseeable manner.

48.    The injuries, conditions, and complications suffered by women who have been implanted with the Pelvic Mesh Product include, but are not limited to, mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), allodynia, blood loss, acute and chronic nerve damage and pain, obturator nerve damage, pudendal nerve damage, pelvic floor damage, chronic pelvic and extrapelvic pain, urinary and fecal

incontinence, and prolapse of organs.  In many cases, these women have been forced to undergo intensive medical treatment, including, but not limited to, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and surgeries to remove portions of the female genitalia, to locate and remove mesh, and to attempt to repair pelvic organs, tissue, and nerve damage.

49.    The medical and scientific literature studying the effects of polypropylene pelvic mesh (like the material used in the Pelvic Mesh Product) have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often implicate errors related to the implantation of the device.

50.    Defendants knew and had reason to know that the Pelvic Mesh Product could and would cause severe and grievous personal injury to the users of the Pelvic Mesh Product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

51.    At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put the Plaintiff, her treating physicians, and the public on notice of the dangers and adverse effects caused by implantation of the Pelvic Mesh Products.

52.    The Pelvic Mesh Products were defective as marketed due to inadequate warnings, instructions, labeling, and/or inadequate testing.

22

53.     The TVT-O is designed to be inserted into and through the obturator internus and groin muscles, placing it in proximity to the obturator nerve; Defendants failed to study or account for anatomic variations of the obturator nerve when designing the device.

54.     The Pelvic Mesh Products were designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which can pull or compress nerves important for sexual function, mobility, bowel function, bladder function, and chronic pelvic and nerve pain (neuralgia). This contraction over time, which can pull, and also cause fibrosis of muscles, adhesions between tissues, and inflammation which impair sexual function, impaired mobility, impaired bowel and bladder function, and chronic pelvic and extrapelvic pain, neuralgia, among other mesh-related issues.

### *Resulting Injury from Defendants' Pelvic Mesh Products*

55.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with Defendants' Pelvic Mesh Products include, but are not limited to: erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, obturator nerve damage/neuralgia, pudendal nerve damage/neuralgia, pelvic floor damage, chronic pelvic pain, emotional distress and mental anguish, and other

debilitating complications. In addition, affected women, including Plaintiff, will need to be continuously monitored because of being implanted with Defendants' Pelvic Mesh Products.

56.    In many of these cases, including that of the Plaintiff, women have had or will have to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia. Removal of contracted, eroded and/or infected transvaginal mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

57.    The medical and scientific literature studying the effects of pelvic mesh products, like that of the TVT-O implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the pelvic mesh products.

58.    To this day, the Pelvic Mesh Products continue to be marketed to the medical community and to patients as safe, effective, and reliable medical devices, implanted by safe, effective, and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments and

24

other competing products.

## FACTUAL BACKGROUND

### *Plaintiff's Implantation with the Pelvic Mesh Products*

59.    Upon information and belief, Dr. Gregory K. Morrow, M.D. recommended the TVT-O to Plaintiff TRINITY BONNER as appropriate and safe for the treatment of her stress urinary incontinence. Consequently, Plaintiff consented to the implantation of the Pelvic Mesh Products.

60.    On June 15, 2015, Plaintiff TRINITY BONNER underwent surgery to address her stress urinary incontinence at Bay Medical Center in Panama City, Florida with Dr. Gregory K. Morrow, M.D. During this surgery, she was implanted with Defendants' TVT-O, identified as follows:

| Description:<br>TVT GYNECARE OBTURATOR KIT | Type:<br>Implant | Size<br>N/A | |
| --- | --- | --- | --- |
| | Qty:<br>1 | Serial #<br>N/A | BMDA:<br>No |
| Note: | Expiration:<br>01/2016 | Lot #<br>3828374 | Model #:<br>810081 |
| | Site:<br>VAGINA | | Mfg:<br>J&J MEDICAL |

61.    The TVT-O implanted in Plaintiff was in the same or substantially similar condition as it was when they left Defendants' possession, and in the condition directed by and expected by Defendants. Plaintiff's treating physician implanted the TVT-O properly and appropriately.

62.    On April 10, 2019, Plaintiff presented to Dr. George Ramie, D.O. at Emerald Coast OBGYN with complaints of feeling her mesh, vaginal tenderness, and painful intercourse (dyspareunia).  Since that time, and as a direct and proximate cause of having the TVT-O implanted in her, Plaintiff has experienced significant mental and physical pain and suffering and has continued to receive treatment for her mesh-related injuries, including but not limited to mesh erosion, pelvic pain, vaginal pain, dyspareunia, urinary issues, and mesh removal.

## DISCOVERY RULE AND TOLLING

63.    To the extent further pleading be necessary, Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

64.    Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, .and the tortious nature of the wrongdoing that caused the injury. Plaintiff, exercising reasonable diligence (including consultation with medical professionals), did not and could not have reasonably discovered the occasion, manner and/or means by which Defendants' breach of duty

occurred until within four years of the filing of this complaint. Further, Plaintiff did not and, exercising reasonable diligence, including consultation with medical professionals, could not discover the existence of her legal cause of action or the injuries caused by Defendants' breach of duty and/or defective products until within four years of the filing of this complaint.

65.    Neither Plaintiff nor her healthcare providers were warned that the Gynecare TVT-O device was unreasonably dangerous or of the risks of the device, outlined herein, even when used exactly as intended by Defendants.  To the contrary, Defendants promoted and sold the type of transvaginal mesh device implanted in Plaintiff and thousands of women like Plaintiff, to healthcare providers as a safe alternative to other procedures that did not incorporate the Defendants' products. Moreover, Defendants continue to deny that its products are defective or cause injuries such as those suffered by Plaintiff and Defendants continue to manufacture, market, and sell all or some of the products at issue.

66.    Any applicable statute of limitations has been tolled by the knowing and active concealment and denial of material facts known by Defendants when Defendants had a duty to disclose and/or by the application of the discovery rule. As a result of Defendant's fraudulent concealment, Plaintiff and her healthcare providers were unaware, and could not have known or have learned through

27

reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of Defendant.

67.    The running of the statute of limitations in this cause is further tolled due to equitable tolling. Defendant is estopped from asserting a statute of limitations defense due to Defendant's fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and her healthcare providers of the true risks associated with the Pelvic Mesh Products.

## FIRST CAUSE OF ACTION
### [Negligence]

68.    At all times herein mentioned, Defendants were engaged in the business of researching, manufacturing, licensing, fabricating, designing, labeling, distributing, using, supplying, selling, marketing, warranting, packaging and advertising the TVT-O pelvic mesh products at issue in this case.

69.    Defendants negligently designed the pelvic mesh devices at issue through its use of polypropylene. Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Plaintiff and others is biologically incompatible with human tissue, and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory

28

response in a large subset of the population implanted with Defendants' Pelvic Mesh Products.

70.     This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response, and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh. Certain information was available in the medical literature regarding the dangers of polypropylene mesh and manufacturers should have been aware of this literature.

    a.     Shrinkage and bacteria lead to an evolving process and increased erosion.[1]

    b.     Polypropylene mesh has long been known to shrink.[2]

---

[1] (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449).

[2] (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). By 1998, polypropylene mesh was known to shrink 30-50%. This was subsequently confirmed in 2007 (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). Predominate infection/inflammation was noted in 2007 in explanted polypropylene samples (Yahi Y. Int Urogyn J 2007; 18(Suppl 1):S149).

c.   The weave of the mesh produces very small interstices which allow bacteria to enter and to hide from the host defenses designed to eliminate them. The bacteria can secrete an encasing slime (biofilm) which further serves to protect them from destruction by white blood cells and macrophages.[3]

d.   The large surface area promotes wicking of fluids and bacteria which provides a safe haven for bacteria which attach themselves to the mesh during the insertion process.[4]

e.   The size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses[5]

f.   Polypropylene is impure: There is no such thing as pure polypropylene. Polypropylene contains about 15 additional compounds which are leached from the polypropylene and are toxic to tissue which enhances the inflammatory reaction and the intensity of fibrosis.[6]

---

[3] (Osterberg B. ActaChirScand1979; 145:431, Merritt K. J BiomatAppl 1991; 5:185, An Y. J Biomed Mater Res (ApplBiomat) 1998; 43:338).

[4] (Mahmoud W. J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

[5] (Mahmoud W. J Biomat Sci Polymer Ed 1996; 7:751, Klinge U. J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

[6] (Sternschuss G. J Urol 2012; May 12 epub, Frostling H. Scand J Work Environ Health 1984; 10:163).

g.   Prolene (polypropylene) was shown to be not inert in 1986 and again in 2003 with flaking and fissuring demonstrated by scanning electron microscopy which leads to degradation and release of toxic compounds. This enhances the inflammatory and fibrotic reactions.[7]

h.   With the loss of polypropylene due to degradation, the surface area is greatly increased thus providing greater areas for bacterial adherence and more elution of toxic compounds from the polypropylene and also the freed toxic polypropylene itself, all of which increases the inflammatory reaction and intensity of fibrosis.[8]

i.    Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia [painful sexual intercourse].[9]

---

[7] (Coda A. Hernia 2003; 7:29, Jongebloed WL. Doc Ophthalmol 1986; 64:143–52).

[8] (Jongebloed W. Doc Ophth 1986; 64:143, Sternschuss G. J Urol 2012; May 12 epub, Clave A. Int Urogyn J 2010; 21:261).

[9] Cosson, M., et al., Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material? Int Urogynecol J Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., Tensile properties of commonly used prolapse meshes. Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., Complications requiring reoperation following vaginal mesh kit procedures for prolapse. Am J Obstet Gynecol, 2008. 199(6): p. 678 e1-4.

j.   Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink in vivo leading to increased stiffness, pain and poor restoration of the normal properties of the vagina.[10]

k.   Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection. Birch C, Fynes MM. The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery.[11]

71.   When the Pelvic Mesh Products, including the TVT-O at issue in this case, are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

72.   Synthetic materials like polypropylene, including that used by the Ethicon Defendants, are known to induce an acute inflammatory response, followed by chronic inflammatory response and foreign-body reaction. A chronic

---

[10] Dora, C.D., et al., Time dependent variations in biomechanical properties of cadaveric fascia, porcine dermis, porcine small intestine submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery. J Urol, 2004. 171(5): p. 1970-3.

[11] Curr Opin Obstet Gynecol. 2002; 14:527–595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. High complication rate identified in sacrocolpopexy patients attributed to silicone mesh. J Urol. 2005;65:1099–1103.

inflammatory response and heightened foreign body reaction have the potential to result in failure of the device to perform safely and effectively, with significant adverse consequences for the patient. Further, a prolonged inflammatory response exposes the polypropylene mesh to a continuous bath of oxidants that may cause in vivo degradation of the mesh.

73.     Contrary to the representations and negligent marketing of Defendants, the Pelvic Mesh Products, including the TVT-O, have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating revision surgeries, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff Trinity Bonner. The defects stem from many issues, including:

a.      the use of polypropylene material in the Pelvic Mesh Products and the immune reaction that results;

b.      the design of the Pelvic Mesh Products to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause immune reactions and subsequent tissue breakdown;

c.      the contraction or shrinkage of the mesh;

d.      biomechanical issues with the design of the mesh that creates strong amounts of friction between the mesh and the underlying tissue that subsequently causes that tissue to degrade;

e.  the use and design of anchors in the Pelvic Mesh Products that when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

f.  degradation of the mesh itself over time which causes the internal tissue to degrade;

g.  the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

h.  the design of the trocars (devices used to insert the Pelvic Mesh Product into the vagina) requires tissue penetration in nerve-rich environments, which results frequently in the destruction of nerve endings.

74.  At all times relevant hereto, Defendants owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care with respect to the safe, legal, and proper manufacture, license, design, formulation, distribution, production, processing, assembly, testing, inspection, research, marketing, labeling, packaging, preparation for use, issuance of warnings with respect to use, promotion, advertising, sale, and safety monitoring of the TVT-O, and to adequately test and warn of the risk and dangers of the TVT-O, both before and after sale.

75.  Defendants marketed the Pelvic Mesh Products, including the TVT-O, to the medical community and to patients as safe, effective, and reliable medical

devices that can be implanted by safe, effective, and minimally invasive surgical techniques.

76.     Defendants marketed and sold the Pelvic Mesh Products, including the TVT-O, through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies included, but are not limited to, aggressive marketing and the provision of valuable cash and non-cash benefits to healthcare providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of this product.

77.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, its Pelvic Mesh Products, including the TVT-O, have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law.

78.     Additionally, Defendants owed to Plaintiff and the public a duty to provide accurate, reliable, and completely truthful information regarding the safety and any dangerous propensities of the pelvic mesh products manufactured, used, distributed, and/or supplied by them and to provide accurate, reliable, and

completely truthful information regarding the failure of the TVT-O to perform as intended or as an ordinary consumer would expect.

79.     Defendants further breached its duty of care in the testing of its Pelvic Mesh Products, including the TVT-O at issue in this case, by failing to conduct adequate testing to ensure that the Pelvic Mesh Products were reasonably safe for implantation in the female pelvic area prior to releasing the Pelvic Mesh Products into the market, failing to conduct post-launch testing following adverse findings in the scientific and medical literature, and by failing to conduct post-launch testing to investigate and evaluate reports in the FDA adverse event databases for their potential significance for Defendants' Pelvic Mesh Products, including the TVT-O. Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Pelvic Mesh Products.

80.     Defendants breached the duty to take all reasonable steps necessary to manufacture and sell products that were not defective or unreasonably dangerous to consumers and users of the products, including Plaintiff herein. Defendants breached the aforementioned duties in that Defendants negligently and carelessly designed, licensed, inspected or failed to inspect, tested or failed to test, inadequately warned or failed to warn of the health hazards, labeled, distributed, handled, used, supplied, sold, marketed, warranted, packaged, promoted, and advertised TVT-O in

that said TVT-O caused, directly and proximately, the injuries of Plaintiff through failure of the TVT-O to perform as intended or as an ordinary consumer would expect. Specifically, Defendants breached the aforementioned duty by, among other things:

a.   Failing to design the TVT-O so as to avoid an unreasonable risk of harm to women in whom the Pelvic Mesh Products at issue herein was implanted, including Plaintiff;

b.   Failing to manufacture the TVT-O so as to avoid an unreasonable risk of harm to women in whom the TVT-O at issue herein was implanted, including Plaintiff;

c.   Failing to use reasonable care in the testing of TVT-O so as to avoid an unreasonable risk of harm to women in whom the TVT-O at issue herein was implanted, including Plaintiff;

d.   Failing to use reasonable care in inspecting the TVT-O at issue herein so as to avoid an unreasonable risk of harm to women in whom the TVT-O at issue herein was implanted, including Plaintiff;

e.   Failing to use reasonable care in the training and instruction to physicians for the safe use of the TVT-O;

f.   Failing to use reasonable care in studying the TVT-O at issue herein to

evaluate its safety and to determine the nature, magnitude, and frequency of serious, life-threatening complications that were known or knowable; and

g.   Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the TVT-O at issue herein.

81.   Defendants also negligently failed to warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.   The use of polypropylene and/or collagen material in the TVT-O and the immune reaction that results from such material, causing adverse reactions and injuries;

b.   The design of the TVT-O to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.   Biomechanical issues with the design of the TVT-O at issue herein, including, but not limited to, the propensity of the TVT-O at issue herein to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.   The use and design of arms and anchors in the TVT-O at issue herein,

which, when placed through the obturator internus muscles in women such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.  The propensity of the TVT-O for "creep," or to gradually elongate and deform when subjected to prolonged tension inside the body;

f.  The inelasticity of the TVT-O at issue herein, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g.  The propensity of the TVT-O at issue herein for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.  The hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

i.  The propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j.  The adverse tissue reactions caused by the products, which are causally related to infection, as the polypropylene is a foreign material; and

k.  The creation of a non-anatomic condition in the pelvis leading to chronic

pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions.

82.     Defendants also negligently failed to warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.     The TVT-O's propensity to contract, retract, and/or shrink inside the body;

b.     The TVT-O's propensity for degradation, fragmentation and/or creep;

c.     The TVT-O's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.     The rate and manner of mesh erosion or extrusion;

e.     The risk of chronic inflammation resulting from the TVT-O at issue herein;

f.     The risk of chronic infections resulting from the TVT-O at issue herein;

g.     The risk of permanent vaginal or pelvic scarring as a result of the TVT-O at issue herein;

h.     The risk of recurrent, intractable pelvic pain and other pain resulting from the TVT-O at issue herein;

i.     The need for corrective or revision surgery to adjust or remove the TVT-O at issue herein;

j.     The severity of complications that could arise as a result of implantation of the TVT-O at issue herein including permanent nerve damage;

k.     The hazards associated with the TVT-O at issue herein;

l.     The TVT-O's defects described herein;

m.     Treatment of stress urinary incontinence with the TVT-O at issue herein is no more effective than feasible available alternatives;

n.     Treatment of stress urinary incontinence with the TVT-O at issue herein exposes patients to greater risk than feasible available alternatives;

o.     Treatment of stress urinary incontinence with the TVT-O at issue herein makes future surgical repair more difficult than feasible available alternatives;

p.     Use of the TVT-O at issue herein puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.     Removal of the TVT-O at issue herein due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.     Complete removal of the TVT-O at issue herein may not be possible and may not result in complete resolution of the complications, including pain.

83.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of their TVT-O, and advertised, promoted, marketed, sold and distributed the its Pelvic Mesh Products, including the TVT-O, as safe medical devices when Defendants knew or should have known that the TVT-O was not safe for their intended purposes, and that the products would cause, and did cause, serious

41

medical problems, and in many patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with the pelvic mesh products, including the TVT-O, were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

84.     At all relevant times herein, Defendants continued to promote the TVT-O as safe and effective even when no clinical trials had been done supporting long or short-term efficacy.

85.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put the Plaintiff, her treating physicians, and the public on notice of the dangers and adverse effects caused by implantation of the TVT-O.

86.     The TVT-O was defective as marketed due to inadequate warnings, instructions, labeling, and/or inadequate testing.

87.     The TVT-O was at all times utilized and implanted in a manner foreseeable to Defendants, as it generated the directions for use, created the procedures for implanting the device, and trained the implanting physicians.

88.     Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the TVT-O, and thus increase the sales of the TVT-O.

89.     The TVT-O implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, as well as being in the condition directed by and expected by Defendants.

90.     Plaintiff and her physician foreseeably used and implanted the TVT-O and did not misuse or alter these products in an unforeseeable manner.

91.     As a proximate result of Defendants' negligent design, marketing, and testing of its TVT-O, including the TVT-O at issue in this case, Plaintiff has been injured catastrophically, sustained severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, loss of enjoyment of life, and economic damages.

92.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## SECOND CAUSE OF ACTION
### [Strict Liability: Design]

93.     Defendant was and is engaged in the business of selling its pelvic mesh products, including the TVT-O, in the State of Florida.

94.     Defendant is a manufacturer and/or supplier of Pelvic Mesh Products, specifically the TVT-O, and is strictly liable to Plaintiff for designing, creating,

43

manufacturing, distributing, selling and placing their Pelvic Mesh Products, specifically the TVT-O, into the stream of commerce.

95.     The TVT-O was designed, marketed, manufactured and distributed by the Defendants and were defective and not reasonably safe due to their improper, inadequate, and defective design.

96.     The TVT-O manufactured, designed, marketed, promoted, and sold by Defendants were expected to, and did, reach Plaintiff without substantial change in the condition in which they was sold and in the condition directed by and expected by Defendants. The TVT-O was defective at the time of manufacture, development, design, production, testing, inspection, endorsement, prescription, sale and distribution, and at the time they left the possession of the Defendants.

97.     Defendants designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the TVT-O at issue herein and Plaintiff was an expected user or consumer of the mesh products.

98.     Defendants' Pelvic Mesh Products, including the TVT-O at issue in this case, were defectively and improperly designed, rendering the products deficient and unreasonably dangerous and hazardous to Plaintiff.

99.     The TVT-O at issue herein that were implanted in Plaintiff were conveyed in a condition not contemplated by reasonable persons among those considered expected users or consumers of the pelvic mesh products, like Plaintiff.

100. Defendants' Pelvic Mesh Products, specifically the TVT-O, manufactured and/or supplied by Defendants, were defective in design or formulation in that, when they left the hands of Defendants, and they were unreasonably dangerous, taking into consideration the utility of these products and the risks involved in their use.

101.   The TVT-O at issue herein that were implanted in Plaintiff were, at the time conveyed, not in conformity with the generally recognized state of the art applicable to the safety of the products at the time the products were designed, manufactured, packaged, labeled and/or sold. There were also safer alternative designs for the devices.

102. Synthetic materials like polypropylene, including that used by the Ethicon Defendants, are known to induce an acute inflammatory response, followed by chronic inflammatory response and foreign-body reaction. A chronic inflammatory response and heightened foreign body reaction have the potential to result in failure of the device to perform safely and effectively, with significant adverse consequences for the patient. Further, a prolonged inflammatory response

exposes the polypropylene mesh to a continuous bath of oxidants that may cause in vivo degradation of the mesh.

103.   The polypropylene mesh used by the Ethicon Defendants for their Pelvic Mesh Products also contracts as a result of the development of scar tissue exacerbated by the foreign body reaction. Polypropylene mesh is known to shrink by up to over 50% during healing. When the transvaginal mesh shrinks during the normal healing process, the arms of the mesh pull on their anchoring points in the pelvic sidewall muscles, tending to pull these anchoring points and the attached muscle toward the midline. In women with these transvaginal mesh implants, including Plaintiff herein, this pulling on the pelvic sidewall muscles causes pain at rest, during sexual intercourse, during defecation, and during normal daily activities like coughing, jumping and straining. This aggravated pulling will cause new or worsening pain to the women in whom the product is implanted. In addition, it is well established that nerves can become entrapped as a result of the chronic inflammatory response and fibrosis surrounding the mesh.

104.   The TVT-O is designed to be inserted into and through the obturator internus muscle, producing a foreseeable risk of acute and chronic myofascial pain as well as a foreseeable risk of (1) obturator neuralgia, by virtue of its passage through the obturator internus muscle, and (2) pudendal neuralgia, by virtue of its

passage through the obturator internus muscle which runs alongside the pudendal nerve as the pudendal nerve passes through Alcock's Canal. Defendant failed to study or account for anatomic variations of the pudendal nerve when designing the device.

105.   The TVT-O was designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which can pull or compress nerves important for sexual function, mobility, bowel function, bladder function, and chronic pelvic and nerve pain (neuralgia). This contraction over time, which can pull, and also cause fibrosis of muscles, adhesions between tissues, and inflammation which impair sexual function, impaired mobility, impaired bowel and bladder function, and chronic pelvic pain, neuralgia, among other mesh-related issues.

106.   Defendants knew or should have known that its Pelvic Mesh Products, including TVT-O, unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began marketing the TVT-O, Defendants were aware that the TVT-O was associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

107.   As referenced above, despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and, when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' TVT-O. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

108.   The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

109.   Defendants' Pelvic Mesh Products, including the TVT-O at issue, were and are unreasonably susceptible to degradation and fragmentation inside the body, shrinkage or contraction inside the body, intense foreign body reaction, chronic inflammatory response, chronic wound healing, chronic infections in and around the mesh fibers, and nerve entrapment in the collagen scar formation. Defendants knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks to the extent they were known or knowable.

110.   Defendants failed to design and establish a safe, effective procedure for removal of its TVT-O, or to determine if a safe, effective procedure for removal of the TVT-O exists.

111.   The specific nature of defects for Defendants' TVT-O include, but are not limited to, the following:

a. The use of polypropylene in the TVT-O and the foreseeable adverse tissue reactions, host defense response, and immune reactions that result from such material leading to ongoing degradation of the mesh, shrinkage, perpetual scarification as the mesh degrades all of which have potential to produce adverse reactions and permanent injuries including but not limited to painful recurrent erosions, direct muscle and soft tissue injury, nerve entrapment or

irritation of adjacent nerves, and associated intractable neuropathic pain and myofascial pain;

b.  The design of the TVT-O to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

c.  The use and design of arms and hooked anchors in the TVT-O, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

d.  The procedure to place the TVT-O requires blindly placing the arms the device through the obturator internus muscles that can injure major nerves that contribute to sexual function, contribute to mobility, and contribute to bowel and bladder function;

e. Biomechanical issues with the design of the TVT-O, including, but not limited to, the propensity of the mesh in the TVT-O to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in serious and permanent injury to the soft tissues and muscles of the pelvic floor without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

f. The propensity of the mesh design characteristics of the TVT-O for plastic deformation when subjected to tension both during implantation and once implanted inside the body which causes the mesh, or portions thereof, to be encapsulated in a rigid scar plate which leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response and chronic pain;

g. The propensity of the mesh used in the TVT-O to become rigid and inflexible, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where the product is implanted, and causing discomfort and pain with normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

h. The propensity of the mesh used in the TVT-O for degradation or fragmentation over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, causes a "barbed wire" or "saw blade" effect by the fragmented surface "sawing" through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface which in turn leads to chronic infections at the mesh surface, and results in continuing injury over time; and

i. The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs.

j. The design of the TVT-O to be inserted into and through the obturator internus muscles produces a foreseeable risk of acute and chronic myofascial pain;

k. The design of the TVT-O to be inserted into and through the obturator internus muscles produces a foreseeable risk of obturator and pudendal neuralgia that may present acutely or months to years after implantation;

l. The design of the TVT-O to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries

without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

m. The use and design of arms and anchors in the TVT-O, which, when placed in women, such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

n. The propensity of the TVT-O for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

o. The inelasticity of the TVT-O, causing the products to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g. intercourse, defecation, or walking) without providing any additional therapeutic benefit when compared to other surgical treatment options for SUI:

p. The hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

q. The propensity of the mesh in the TVT-O to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

r. The hardening of the TVT-O in the body;

53

s. The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions that are unique to polypropylene without providing any additional therapeutic benefit when compared to other non-polypropylene surgical treatment options for SUI;

t. The use of polypropylene material in the TVT-O and the failure to provide adequate directions for use ("DFU") or instructions for use ("IFU") and training.

112.   As designed, Defendants' Pelvic Mesh Products, including the TVT-O, were and are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their healthcare providers.

113.   Defendants' Pelvic Mesh Products, including the TVT-O, create risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions, and which far outweigh the utility of the Pelvic Mesh Products.

114.   Defendants' Pelvic Mesh Products, including the TVT-O, are dangerous beyond that which would be contemplated by an ordinary person, doctor,

or patient with the ordinary knowledge common to the community as to its characteristics.

115.   With respect to Plaintiff in particular, flaws with the TVT-O's design, including but not limited to the weight and pore size of the polypropylene mesh used in the TVT-O, and the transobturator design of the TVT-O device.[12] As a direct and proximate result of these design flaws, Plaintiff has suffered and in all reasonable dyspareunia, neuromuscular pain, disabling pelvic pain, abdominal pain, erosion, urinary problems, groin pain, vaginal pain, leg pain, recurrence of incontinence, impairment of mobility, loss of enjoyment of life, and economic damages.

116.   Feasible, reasonable, and suitable alternative designs as well as reasonable suitable alternative procedures and instruments for repair of stress urinary incontinence have existed at all times relevant to this matter, including, but not limited to the following: the Burch Procedure colposuspension with delayed absorbable sutures; autologous fascia slings; an allograft sling using a product like Repliform or other biological matrix; a sling with less polypropylene such as

---

[12] As stated previously, the transobturator design of the TVT-O requires it be inserted into and through the obturator internus muscle, producing a foreseeable risk of acute and chronic myofascial pain as well as a foreseeable risk of: (1) obturator neuralgia, by virtue of its passage through the obturator internus muscle, and (2) pudendal neuralgia, by virtue of its passage through the obturator internus muscle which runs alongside the pudendal nerve as the pudendal nerve passes through Alcock's Canal.

Ultrapro; a sling made with DynaMesh or other Polyvinylidene fluoride (PVDF) alternative, a retropubic sling, a retropubic mini-sling, such as the TFS device from TFS Surgical; or a retropubic sling or retropubic mini-sling comprised of a polymer-based alternative to polypropylene, such as DynaMesh or other Polyvinylidene fluoride (PVDF) alternative.

117.   As a direct and proximate result of the wrongful acts and omissions of Defendants, Plaintiff suffered severe injuries, emotional distress, and economic damages for which she now seeks damages in an amount in excess of the minimum jurisdiction limits of this Court.

118.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000 and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

### THIRD CAUSE OF ACTION
### [Strict Liability: Marketing/Failure to Warn]

119.   Defendants designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the TVT-O.

120.   Defendants' TVT-O are defective due to Defendants' failure to adequately warn or instruct Plaintiff and/or her health care providers.

121.   In their instructions for use (IFU), as well as the marketing materials they prepared and disseminated to patients and healthcare providers, Defendants omitted critical information regarding the risks and potential complications of the TVT-O. Specifically, Defendants failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the following (subsequently referred to as the "Risks and Potential Complications"):

a.     That the TVT-O was not studied prior to launch for safety and efficacy;

b.     That the TVT-O has propensities to contract, retract, and/or shrink inside the body;

c.     That the TVT-O has propensities for degradation, fragmentation, and/or creep;

d.     That the TVT-O's inelasticity prevents proper mating with the pelvic floor and vaginal region;

e.     The magnitude of the risk of mesh erosion or extrusion;

f.     The risk of chronic inflammation resulting from the TVT-O;

g.     The risk of chronic infections resulting from the TVT-O;

h.     The risk of developing chronic regional pain syndrome as a result of chronic inflammation/infection;

i.     The risk of permanent vaginal or pelvic scarring as a result of the TVT-O;

j.      The risk of recurrent, intractable pelvic pain, nerve pain, and other pain resulting from the TVT-O;

k.      The risk of direct nerve injury to the obturator nerve;

l.      The risk of secondary nerve irritation to the obturator nerve;

m.      The risk of secondary nerve irritation to the pudendal nerve;

n.      The magnitude of the risk of dyspareunia (painful sexual intercourse) in patients;

o.      That the TVT-O may result in dyspareunia that makes vaginal penetration impossible;

p.      The frequency with which the need for corrective or revision surgery to adjust or remove the TVT-O may occur in patients;

q.      The magnitude of the risk of acute and long-term complications that could arise as a result of implantation of the TVT-O in patients;

r.      The hazards associated with the TVT-O, including obturator, pudendal, and ilioinguinal neuralgia, permanent nerve damage, and pelvic floor and groin myalgia;

s.      That treatment of SUI with the Pelvic Mesh Products exposes patients to greater risk than feasible available devices for SUI, including pelvic mesh products utilizing alternative polypropylene material or non-polypropylene surgical products, alternatives, and procedures;

t.    That treatment with the TVT-O makes future surgical repair more difficult than feasible available alternatives;

u.    That the TVT-O offers no improvement in efficacy compared to non-mesh repairs and non-mesh repairs do not place the obturator or pudendal nerve at risk acutely or over time;

v.    That use of the TVT-O puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

w.    That removal of the TVT-O due to complications may significantly impair the patient's quality of life;

x.    That complete removal of the TVT-O may not be possible;

y.    That complete removal of the TVT-O may not result in complete resolution of the complications, including pain;

z.    The foreseeable and unavoidable risk of acute obturator and/or pudendal neuralgia or obturator, and/or pudendal neuralgia occurring months or years after implantation;

aa.    The magnitude of the risk of obturator and/or pudendal neuralgia; and

bb.    The risk of permanent injury and pain to the muscles and soft tissues of the pelvic floor that may occur acutely after implantation or become symptomatic months or years after implantation.

122.   Defendants failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the proper candidates for, and the safest and most effective methods of, implantation and use of Defendants' Pelvic Mesh Products, including the TVT-O. Defendants also failed to properly and adequately warn and instruct Plaintiff and her healthcare providers with regard to the inadequate research and testing of the Pelvic Mesh Products, including the TVT-O, and the complete lack of a safe, effective procedure for removal of the Pelvic Mesh Products. Defendants intentionally, recklessly, and maliciously misrepresented the safety, risks, and benefits of Defendants' Pelvic Mesh Products, including the TVT-O at issue in this case, understating the risks and exaggerating the benefits in order to advance its own financial interests, with wanton and willful disregard for Plaintiff's rights and health.

123.   The TVT-O is also defective due to Defendants' failure to adequately warn or instruct Plaintiff and/or her health care providers after the product left the manufacturer and before and after implantation of the TVT-O of subjects including, but not limited to, the following:

a.  The TVT-O's propensity to contract, retract, and/or shrink inside the body;

b.  The TVT-O's propensity for degradation, fragmentation and/or migration;

c.  The TVT-O's inelasticity preventing proper mating with the pelvic floor and

vaginal region;

d.  The frequency and manner of transvaginal mesh erosion or extrusion resulting from the TVT-O;

e.  The risk of chronic inflammation resulting from the TVT-O;

f.  The risk of chronic infections resulting from the TVT-O;

g.  The risk of permanent vaginal or pelvic scarring resulting from the TVT-O;

h.  The risk of de novo urinary dysfunction resulting from the TVT-O;

i.  The risk of de novo dyspareunia or painful sexual intercourse resulting from the TVT-O;

j.  The risk of recurrent, intractable pelvic pain and other pain resulting from the TVT-O;

k.  The need for corrective or revision surgery to adjust or remove the TVT-O which in some cases is not feasible nor possible;

l.  The severity of complications that could arise as a result of implantation of the TVT-O;

m. The hazards associated with the TVT-O;

n.  The TVT-O's defects described herein;

o.  Treatment of stress urinary incontinence with Defendants' TVT-O is no more effective than feasible, available and safer alternatives;

p. Treatment of stress urinary incontinence with Defendants' TVT-O exposes patients to greater risk than feasible, available and safer alternatives;

q. Treatment of stress urinary incontinence with the TVT-O makes future surgical repair more difficult than feasible, available and safer alternatives;

r. Use of the TVT-O puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

s. Removal of the TVT-O due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

t. Complete removal of the TVT-O may not be possible and may not result in complete resolution of the complications, including pain; and

u. The nature, magnitude, and frequency of the complications that could arise as a result of implantation of the TVT-O.

124. Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including Plaintiff. As a result, Defendants actively and intentionally misled and continues to mislead the public into believing that the TVT-O and the procedures for implantation were and are safe and effective.

125. Defendants underreported and continues to underreport information about the propensity of their TVT-O to fail and cause injury and complications and

have made unfounded representations regarding the efficacy and safety of the TVT-O through various means and media.

126.   Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with their TVT-O, including the magnitude and frequency of these risks.

127.   At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, the medical community, Plaintiff's treating physicians, and the general public on notice of the dangers and adverse effects caused by implantation of the Defendants' TVT-O.

128.   Defendants' TVT-O, as designed, manufactured, distributed, sold and/or supplied by Defendants, were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

129.   The risk of serious injuries was known or should have been known to Defendants, but in spite of these risks, Defendants continued to market the TVT-O for transvaginal use to physicians and patients, including Plaintiff and Plaintiff's healthcare providers, without adequate warnings.

130.   Had Defendants properly and adequately warned and instructed Plaintiff and her healthcare providers with regarding to the TVT-O's Risks and

Potential Complications, upon information and belief, Plaintiff would not have been recommended implantation of the TVT-O, and Plaintiff would not have proceeded with implantation of the TVT-O, thus avoiding the injuries Plaintiff has alleged herein.

131.   Defendants, by exercising reasonable diligence, could have made such warnings available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

132.   As a direct and proximate result of Defendants' failure to provide Plaintiff, Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings, Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the TVT-O.

133.   As a direct and proximate result of the wrongful acts and omissions of Defendants, Plaintiff suffered severe injuries, emotional distress, and economic damages.

134.   By reason of the foregoing, Plaintiff has sustained damages in an amount in excess of the jurisdiction limits of all the lower courts which would have had jurisdiction.

135.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, and for costs in excess of $75,000

and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## DAMAGES

### *General and Special Damages*

136.   As a direct and proximate result of having the TVT-O implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury which includes or more likely than not may include, inter alia, any of the following dyspareunia, neuromuscular pain, disabling pelvic pain, abdominal pain, erosion, urinary problems, groin pain, vaginal pain, leg pain, recurrence of incontinence, impairment of mobility, physical impairment, disfigurement, will likely undergo medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

137.   The injuries suffered by Plaintiff were caused by the wrongful acts and omissions of Defendants.

### *Exemplary Damages*

138.   At all times relevant herein, Defendants:

a.   Knew that their Pelvic Mesh Products, including the TVT-O, were

dangerous, ineffective, and caused significant, life-altering complications

65

and side-effects;

b.      Concealed the dangers and health risks from Plaintiff, physicians, hospitals, other medical providers, the FDA, its users and the public at large;

c.      Made misrepresentations to Plaintiff, physicians, hospitals, other medical providers, its users and the public at large as to the safety and efficacy of its Pelvic Mesh Products, including TVT-O; and

d.      With full knowledge of the health risks associated with its Pelvic Mesh Products, including the TVT-O, and without adequate warnings of the same, manufactured, designed, marketed, promoted, developed, sold and/or distributed its Pelvic Mesh Products, including the TVT-O, for routine use.

139.   Defendants, by and through their officers, directors, managing agents, authorized sales representatives, employees and/or other agents engaged in acts and/or omissions involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others. As such, the conduct of Defendants warrants the imposition of exemplary damages under all applicable legal standards.

140.    Defendants have intentionally and recklessly designed, marketed, labeled, sold, and distributed its Pelvic Mesh Products (including the TVT-O) with wanton and willful disregard for the rights and health of Plaintiff, and with malice, placing its economic interests above the health and safety of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands trial by jury, and pray for judgment against Defendant as follows:

1.    A judgment against Defendants holding them liable for compensatory damages in a reasonable amount determined to be fair and just by the jury in this cause sufficient to adequately compensate Plaintiff for her harms and losses, including but not limited to damages:

a.  For past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

b.  For past and future economic and special damages, according to proof at the time of trial;

c.  For past and future medical and incidental expenses, according to proof at the time of trial;

d.  For past and future loss of earnings and impaired earning capacity, according to proof at the time of trial;

e.  For past and future physical impairment;

f.   For past and future physical disfigurement; and

g.   For past and future pain and suffering, as well as mental and emotional

distress, according to proof at the time of trial.

2.      For punitive and exemplary damages in a reasonable amount

determined to be fair and just by the jury;

3.      For costs, attorneys' fees, interest, or any other relief, monetary or

equitable, to which she is entitled; and

4.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues in the above captioned

matter.

Date: January 26, 2022

Respectfully submitted,

**BABBITT & JOHNSON, P.A.**

*/s/ Joseph R. Johnson*
JOSEPH R. JOHNSON
FL Bar No.: 372250
JJohnson@babbitt-johnson.com
kaguilera@babbitt-johnson.com
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
(561) 684-2500

**MARTIN BAUGHMAN, PLLC**

BEN C. MARTIN
Texas Bar No. 13052400
(*pro hac vice* to be filed)
bmartin@martinbaughman.com
LAURA J. BAUGHMAN
(*pro hac vice* to be filed)
Texas Bar No. 00791846
lbaughman@martinbaughman.com
RACHEL L. WRIGHT
(*pro hac vice* to be filed)
Texas Bar No. 24054255
rwright@martinbaughman.com
3141 Hood Street, Level 6
Dallas, TX 75219
Office: 214.761.6614
Fax: 214.744.7590

**ATTORNEYS FOR PLAINTIFF**